IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 14-00348-01-CR-W-BCW |
| | ) | |
| JORDAN C. DAVIS, | ) | |
| | ) | |
| Defendant. | ) | |

REPORT AND RECOMMENDATION

This matter is currently before the Court on defendant's Motion to Suppress Illegally Obtained Evidence and Statements (doc #22). For the reasons set forth below, it is recommended that the motion be denied.

I. BACKGROUND

On December 9, 2014, a criminal complaint was filed charging defendant Jordan C. Davis with being a felon in possession of a firearm.

On December 17, 2014, the Grand Jury returned an eight-count indictment against defendant Davis. Counts Five, Six, Seven and Eight of the indictment charge that on September 11, 2013, defendant possessed with intent to distribute methamphetamine and marijuana, carried a .45 caliber Remington pistol in furtherance of these drug trafficking crimes and was a felon and drug user in possession of a firearm and ammunition. Count Four charges that on December 30, 2013, defendant possessed with intent to distribute methamphetamine. Counts One, Two and Three charge that on December 8, 2014, defendant possessed with intent to distribute methamphetamine, carried a .25 caliber Titan pistol in furtherance of this drug trafficking crime

and was a felon and drug user in possession of a firearm.

An evidentiary hearing on the motion to suppress was held on April 17, 2015. Defendant Davis was represented by Assistant Federal Public Defender Anita L. Burns. The Government was represented by Assistant United States Attorney Rudolph R. Rhodes, IV. The Government called Officer Jason Harris of the Independence, Missouri Police Department, and Officer Terrence Brown and Detective Troy Schwalm of the Kansas City, Missouri Police Department as witnesses. The defense called no witnesses to testify.

## II. FINDINGS OF FACT

On the basis of the evidence presented at the evidentiary hearing, the undersigned submits the following proposed findings of fact:

1. On September 11, 2013, at approximately 8:09 p.m., Officers Jason Harris and Jeremie Stauch were patrolling the area of Stark and Smart in Independence, Missouri. (Tr. at 4) Officer Harris testified that he was assigned to the Independence, Missouri Police Department SWAT team. (Tr. at 3-4) Officer Harris' duties with the SWAT team included serving high-risk search warrants, proactive patrolling, executing arrest warrants and looking for suspects. (Tr. at 4) Officer Harris testified that the area he and Officer Stauch were patrolling is a high-crime area for burglaries, narcotics sales, stolen autos, etc. (Tr. at 4) On August 23, 2013, Officer Harris had assisted in recovering a stolen automobile which was parked in front of 8721 Smart. (Tr. at 5) Inside that stolen automobile, officers had found a party with drugs. (Tr. at 5) Officers Harris and Stauch also had information that drugs were being sold out of two residences on Smart, 8721 and 8725, so the officers decided to go to that area. (Tr. at 5)

2. While driving in that area, the officers observed a vehicle parked at 8721 Smart. (Tr. at 5) It was occupied by two white females in the front seat and a white male in the back seat. (Tr. at 5) The officers decided to go back and check on the vehicle and its occupants. (Tr. at 6) The officers intended to contact the occupants in the vehicle and ask what they were doing parked in that area. (Tr. at 21) The officers did a U-turn and observed the brake lights on the vehicle come on and the male (Jordan Davis) exit the driver's side rear passenger seat. (Tr. at 6) Officer Harris testified that he observed Davis walking around the rear of the vehicle at a faster than normal pace, reach into his waistband, do a bend-down motion on the passenger side of the vehicle and then walk up to the passenger front

2

window of the vehicle. (Tr. at 7-8, 23) Officer Harris testified that he thought Davis was possibly drawing a weapon and trying to conceal it or hide some other form of contraband. (Tr. at 8)

3. The officers activated their lights and the spotlight on the vehicle because they thought the male (defendant Davis) might run. (Tr. at 7) Officer Harris opened his door and began to draw his weapon because he believed that Davis was possibly armed. (Tr. at 8) Officer Harris commanded Davis to show his hands. (Tr. at 8) Officer Harris testified that Davis reached into his left front pocket, grabbed something that appeared to be a plastic bag and threw it inside the vehicle onto the female who was in the front passenger seat. (Tr. at 8) Officer Harris believed that Davis was trying to get rid of some form of contraband. (Tr. at 9) Davis was not obeying the command to show his hands, instead he kept his arms down at his sides. (Tr. at 9) Officer Harris went to detain Davis based on his observation of Davis placing something underneath the vehicle and then throwing a plastic bag inside the vehicle and because Officer Harris believed Davis was possibly armed. (Tr. at 9-10) Davis initially resisted Officer Harris' attempt to restrain him, but complied when placed in a wristlock and was put in handcuffs. (Tr. at 10)

4. Officer Harris frisked the male (defendant Davis) for weapons. (Tr. at 10) No weapon was found on Davis' person. (Tr. at 10) Officer Harris had Davis sit on the ground with his feet crossed. (Tr. at 10) Officer Harris then approached the front passenger side of the vehicle. (Tr. at 10) The female in the front passenger seat advised that the item Davis threw in the vehicle was still on her person. (Tr. at 10) The females in the vehicle had their hands up as they had been following the verbal commands of Officer Stauch. (Tr. at 11) Officer Harris observed a plastic bag that appeared to contain several smaller plastic bags containing a crystal-like substance on the female's right torso. (Tr. at 11) Officer Harris believed the crystal-like substance to be methamphetamine. (Tr. at 11) Officer Harris seized the plastic bag. (Tr. at 11)

5. Believing that drug trafficking was taking place, the officers placed all three individuals under arrest for possession of a controlled substance. (Tr. at 11-12) Officer Harris then performed a search incident to arrest of defendant Davis. (Tr. at 12) In Davis' left front pocket, Officer Harris found a wad of U.S. currency. (Tr. at 12) After both females had been taken into custody, Officer Stauch walked around the vehicle and observed a firearm underneath the front passenger door, the area where Davis had been observed bending down. (Tr. at 13)

6. Given that all the occupants of the vehicle were under arrest, the officers ordered a tow of the vehicle. (Tr. at 12) The Independence Police Abandoned Property and Police Towing Policy provides:

3

> Police Towing of Vehicles from Public Property
>
> Police towing of a vehicle from public property is authorized under the following conditions:
>
> Section 304.155., RSMo allows any law enforcement officer's [sic] within their jurisdiction … to authorize a towing company to remove abandoned property to a place of safety as follows:
>
> * * *
>
> 4. Any abandoned property for which the person operating such property is arrested for an alleged offense for which the officer is required to take the person into custody and where such person is unable to arrange for the property's timely removal.

(Government's Ex. 9 at 2) It is standard policy to conduct an inventory search of a vehicle that is to be towed. (Tr. at 12) Officer Harris performed an inventory search of the vehicle. (Tr. at 13) A backpack was located in the center of the backseat. (Tr. at 13) Inside the backpack, Officer Harris found drug paraphernalia, which included scales and cut straws, a laptop, a box of .45 ammunition and another single .45 auto round in a plastic bag. (Tr. at 13)

7. Defendant Davis' criminal history was checked and it was determined that he was a convicted felon and known to be armed and dangerous. (Tr. at 13-14)

8. On December 8, 2014, Officer Terrence Brown received a call from dispatch on a party wanted at 1702 Bellaire, Kansas City, Missouri. (Tr. at 26-27) Officer Brown waited for a second officer to respond and then he and Officer Darren King proceeded to 1702 Bellaire. (Tr. at 27) The officers went up to the door of 1702 Bellaire, the right-hand side of a duplex, to knock and announce to see if anyone would respond to the door. (Tr. at 27) The officers opened the storm door which was ajar to knock on the front door and found that the front door was also ajar. (Tr. at 27-28) Officer Brown testified that he always opens a storm door to knock on a front door because in his experience, people can hear a knock on a front door better than a knock on a storm door. (Tr. at 44) The officers knocked and announced and saw a male sitting on a sofa to the right of the door. (Tr. at 28) The officers pushed the door open and announced again, "Police." (Tr. at 29) As the male stood up, Officer Brown observed a gun on the male's right knee which fell to the floor. (Tr. at 29)

9. Officer Brown yelled out, "Gun," to his partner. (Tr. at 30) The male, Jordan Davis, was instructed to show his hands and turn around. (Tr. at 30) The officers handcuffed Davis and took him outside. (Tr. at 30) The officers then observed drugs on the coffee table and a meth pipe and the gun on the floor. (Tr. at 30-31)

The gun was loaded with one round in the chamber and seven rounds in the magazine. (Tr. at 30)

10. A second individual, Mr. Adams, came from around the back of the unit. (Tr. at 36) Mr. Adams said that he resided there. (Tr. at 36) Mr. Adams was also placed in handcuffs. (Tr. at 36) As officers cleared the residence, they found a woman inside the residence who was Adams' girlfriend and then another woman, Nicole Krueger, the wanted party for whom the officers had been dispatched to the residence. (Tr. at 37) Ms. Krueger was placed under arrest on three Kansas City warrants and a stop order out of the Fraud and Forgery Unit of the Kansas City, Missouri Police Department. (Tr. at 37-38)

11. Defendant Davis' criminal history was checked and it was determined that he was a convicted felon. (Tr. at 38) Davis was in possession of a gun and drugs so he was taken into custody. (Tr. at 38) Davis was searched when he was taken into custody. (Tr. at 38) Five or six rounds of ammunition were found in his pocket. (Tr. at 38)

12. Detective Troy Schwalm, along with Detective Rorabaugh, interviewed defendant Davis at police headquarters on December 8, 2014. (Tr. at 49) Detective Schwalm testified that he advised Davis of his constitutional rights by reading aloud to Davis from the Miranda Warning and Waiver, Form 340 P.D. (Tr. at 49-50) After reading Davis his rights, Detective Schwalm asked Davis if he understood his rights. (Tr. at 51) Davis indicated that he understood his rights and was willing to talk to the officers. (Tr. at 51) Davis signed the waiver form. (Tr. at 51; Government's Ex. 14)

13. Detective Schwalm testified that while defendant Davis appeared to be a little sleepy, he did not appear to be intoxicated. (Tr. at 52) Detective Schwalm testified that he asked Davis if he considered himself to be under the influence of alcohol or drugs and Davis responded that he did not feel that he was under the influence. (Tr. at 52) Detective Schwalm testified that Davis appeared to understand his rights and that his speech was coherent. (Tr. at 52) Davis did not request an attorney nor did he invoke his right to remain silent. (Tr. at 52) Detective Schwalm testified that no threats or promises were made to Davis. (Tr. at 52)

14. When asked where he lived for background information, defendant Davis responded that he lived alone at 1842 East 59th Terrace. (Tr. at 53-54) Davis told the detectives that he had arrived at 1702 Bellaire approximately twenty minutes before the police arrived and that he was there waiting on a ride. (Tr. at 54-55) Davis stated that he was friends with Nicole Krueger and that he had dated Nicole's sister some years earlier. (Tr. at 54) Davis indicated that the things on the table and those items which were recovered from the residence belonged to him. (Tr. at 56)

III.  DISCUSSION

Defendant Davis seeks to suppress all evidence and testimony concerning a Remington .45 caliber pistol, 25 cartridges of .45 caliber ammunition, 8.61 grams of methamphetamine and 20.5 grams of marijuana recovered from Davis and from the ground near a vehicle parked at 8721 Smart on September 11, 2013; a Titan .25 caliber pistol loaded with seven rounds of .25 caliber ammunition and .26 grams of methamphetamine recovered from a residence located at 1702 Bellaire Avenue on December 8, 2014; and all statements made by defendant.  (Motion to Suppress Illegally Obtained Evidence and Statements (doc #22 at 1)  Specifically, defendant argues that officers had no reasonable suspicion to stop him on September 11, 2013, so any evidence seized as a result of the stop must be suppressed.  (Id. at 3)  Further, defendant argues that the officers' entry into the residence in which he was present on December 8, 2014, was unlawful, thereby requiring the suppression of evidence recovered as a result of the unlawful entry.  (Id. at 4-5)  Finally, defendant argues that any statements he made must be suppressed as fruits of the unreasonable searches and seizures.  (Id. at 3-4 and 5)

    A.    September 11, 2013

        1.    Investigative Stop and Arrest

Both investigative stops and arrests are seizures.  However, an investigative stop need only be supported by a reasonable, articulable suspicion that criminal activity may be afoot, whereas an arrest must be supported by probable cause.  See Terry v. Ohio, 392 U.S. 1, 25-31 (1968); United States v. Raino, 980 F.2d 1148, 1149 (8th Cir. 1992), cert. denied, 507 U.S. 1011 (1993).

The record in this case establishes that while patrolling in an area known for burglaries, narcotics sales and stolen automobiles, and specifically at the address of 8721 Smart where the

officers had information that drugs were being sold out of the residence and where Officer Harris had recently assisted in recovering a stolen automobile, Officers Harris and Stauch observed a vehicle parked with two females in the front seat and one male (defendant Davis) in the back seat. (See Fact Nos. 1 and 2, supra)  The officers did a U-turn and observed the brake lights on the vehicle come on and the male exit the driver's side rear passenger seat.  (See Fact No. 2, supra) Officer Harris testified that he observed the male hurry around the rear of the vehicle, reach into his waistband and bend down on the passenger side of the vehicle.  (Id.)  Officer Harris testified that he thought the male was possibly drawing a weapon and trying to conceal it or hide some other form of contraband.  (Id.)  The officers activated their lights and a spotlight on the vehicle.  (See Fact No. 3, supra)  Officer Harris drew his weapon and commanded the male to show his hands because he believed the male was possibly armed.  (Id.)  Officer Harris testified that the male reached into his left front pocket, grabbed something that appeared to be a plastic bag and threw it inside the vehicle onto the female in the right front passenger seat.  (Id.)  Officer Harris believed that the male was trying to get rid of some form of contraband.  (Id.)  The male still was not obeying the command that he show his hands.  (Id.)  Officer Harris attempted to restrain the male and the male resisted.  (Id.)  Officer Harris eventually handcuffed the male (defendant Davis) and frisked him for weapons.  (See Fact Nos. 3 and 4, supra)  The Court finds that the officers had a reasonable, articulable suspicion that defendant Davis may have been engaged in criminal activity based on Davis' behavior after the officers did a U-turn and that the officers were, therefore, justified in contacting him.  See United States v. Willis, 967 F.2d 1220, 1223-24 (8th Cir. 1992)(flight and disposal of items at approach of law officers provides reasonable suspicion that warrants investigative stop).

Further, "a police officer may take steps reasonably necessary to protect his or her

personal safety and the safety of others and to maintain the status quo of a situation while verifying or dispelling suspicion in a short period of time." United States v. Seelye, 815 F.2d 48, 50 (8th Cir. 1987)(citing United States v. Jones, 759 F.2d 633, 636-37 (8th Cir.), cert. denied, 474 U.S. 837 (1985)). Protective searches for possible weapons allow for the use of handcuffs. See United States v. Walker, 555 F.3d 716, 721 (8th Cir. 2009); United States v. Miller, 974 F.2d 953, 957 (8th Cir. 1992)("a police officer's use of handcuffs can be a reasonable precaution during a Terry stop"). The Court finds that Officer Harris' actions in handcuffing and frisking defendant were reasonably necessary to protect the officers' personal safety as well as the personal safety of the females in the vehicle and to maintain the status quo so that the officers could determine whether defendant was engaged in criminal activity. No constitutional violation took place.

The female seated in the right front passenger seat advised that the item Davis threw in the vehicle was still on her person. (See Fact No. 4, supra) Officer Harris observed a plastic bag that appeared to contain several smaller plastic bags containing a crystal-like substance that Harris believed to be methamphetamine on the female's right torso. (Id.) Believing that drug trafficking was taking place, the officers placed all three individuals under arrest for possession of a controlled substance. See Fact No. 5, supra) With the discovery of the methamphetamine, the Court finds that the officers had probable cause to place defendant Davis under arrest and to search his person incident to that arrest.

    2.    Seizure of the Firearm

After defendant Davis and the two females had been taken into custody, Officer Stauch walked around the vehicle and observed a firearm underneath the front passenger door, the area where defendant Davis had been observed bending down. (See Fact No. 5, supra) It is settled

8

Case 4:14-cr-00348-BCW   Document 36   Filed 05/13/15   Page 8 of 14

law that an officer "may seize, without a warrant, an item that is 1) in plain view 2) when it is observed from a lawful vantage point 3) where the incriminating character of the item is immediately apparent." United States v. Banks, 514 F.3d 769, 773 (8th Cir.), cert. denied, 553 U.S. 1100 (2008)(footnote omitted). See also Payton v. New York, 445 U.S. 573, 587 (1980)("The seizure of property in plain view involves no invasion of privacy and is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity.") Officer Stauch was justifiably present at the scene when he saw a firearm in plain view underneath the vehicle. The Court finds that the incriminating character of a firearm placed underneath a vehicle by a person attempting to leave the area as police approach was immediately apparent to Officer Stauch and that Officer Stauch had a lawful right to access the firearm and make it safe. The seizure of the firearm was proper.

3. Warrantless Search of the Vehicle

In Arizona v. Gant, 556 U.S. 332 (2009), the United States Supreme Court provided the following basic guidance when analyzing a warrantless search:

> Consistent with our precedent, our analysis begins, as it should in every case addressing the reasonableness of a warrantless search, with the basic rule that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment–subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967)(footnote omitted).

Gant, 556 U.S. at 338.

a. Search Incident to Arrest

"Among the exceptions to the warrant requirement is a search incident to a lawful arrest. ... The exception derives from interests in officer safety and evidence preservation that are typically implicated in arrest situations." Arizona v. Gant, 556 U.S. 332, 338 (2009)(citations omitted).

9

Where there is no possibility that an arrestee could reach into his vehicle and obtain a weapon, there is no longer authority for police to search a vehicle as a search incident to arrest in the interest of officer safety. Id. at 343. However, the Gant court found that a search incident to arrest is justified if it is reasonable to believe that evidence relevant to the crime of arrest might be found in the vehicle. Id.

In this case, the officers believed that drug trafficking had been taking place by persons in the vehicle. (See Fact No. 5, supra) Defendant Davis attempted to leave when the officers turned around and was observed placing a firearm underneath the vehicle and then throwing a baggie containing methamphetamine back into the vehicle. (See Fact Nos. 2 through 5, supra) Defendant Davis and the two females were arrested for possession of a controlled substance. (See Fact No. 5, supra) The Court finds that it was reasonable for the officers to believe that evidence relevant to the crime of arrest might be found in the vehicle.

b. Automobile Exception

In Arizona v. Gant, 556 U.S. 332 (2009), the Court listed other established exceptions to the warrant requirement, including the "automobile exception." The Court stated:

> Other established exceptions to the warrant requirement authorize a vehicle search under additional circumstances when safety or evidentiary concerns demand. ... If there is probable cause to believe a vehicle contains evidence of criminal activity, United States v. Ross, 456 U.S. 798, 820-21 (1982), authorizes a search of any area of the vehicle in which the evidence might be found. ... Ross allows searches for evidence relevant to offenses other than the offense of arrest, and the scope of the search authorized is broader.

Gant, 556 U.S. at 346-47. "Probable cause exists 'where, in the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" United States v. Cortez-Palomino, 438 F.3d 910, 913 (8th Cir. 2006)(quoting United States v. Kennedy, 427 F.3d 1136, 1141 (8th Cir. 2005)).

10

As set forth above, the officers believed that drug trafficking had been taking place by persons in the vehicle. (See Fact No. 5, supra) Defendant Davis attempted to leave when the officers turned around and was observed placing a firearm underneath the vehicle and then throwing a baggie containing methamphetamine back into the vehicle. (See Fact Nos. 2 through 5, supra) A wad of currency was found in Davis' pocket. (See Fact No. 5, supra) Based on these facts, the Court finds that the officers had probable cause to believe that evidence of criminal activity would be found within the vehicle. Thus, pursuant to the automobile exception, the officers were authorized to conduct a warrantless search of the vehicle that was as thorough as a search authorized by warrant.

        c.        Inventory Search

The search of the vehicle can also be justified as an inventory search. A warrantless inventory search of a vehicle is valid if it is conducted pursuant to standardized police procedures and not done in bad faith or for the sole purpose of investigation. See Colorado v. Bertine, 479 U.S. 367, 372 (1987); United States v. Baldenegro-Valdez, 703 F.3d 1117, 1125-26 (8th Cir.), cert. denied, 133 S.Ct. 2403 (2013). As set forth above, defendant Davis and the two females had been placed under arrest. (See Fact No. 5, supra) The Independence Police Abandoned Property and Police Towing Policy provides that a vehicle may be towed when the driver of the vehicle is arrested and such vehicle would thereby be left abandoned upon public property. (See Fact No. 6, supra) The Court finds that the inventory search was conducted pursuant to standardized police procedures and that it was not done in bad faith or for the sole purpose of investigation.

Given the Court's finding that the officers' initial contact with defendant Davis, the subsequent arrest of Davis, the discovery of the firearm in plain view underneath the vehicle and

11

the search of the vehicle (either as a search incident to arrest, pursuant to the automobile exception or as an inventory search) were proper, there is no basis for suppression of any evidence seized on September 11, 2013.

    B.    December 8, 2014

"Because Fourth Amendment rights are personal and may not be asserted vicariously, we must first determine whether [the defendant] had a legitimate expectation of privacy in the area searched or the item seized." United States v. Gomez, 16 F.3d 254, 256 (8th Cir. 1994)(citing Rakas v. Illinois, 439 U.S. 128, 138-44 (1978)). The Gomez court continued:

> If a defendant fails to prove a sufficiently close connection to the relevant places or objects searched he has no standing to claim that they were searched or seized illegally. The defendant moving to suppress has the burden of proving a reasonable expectation of privacy in the area searched. Factors relevant to the determination of standing include: ownership, possession and/or control of the area searched or item seized; historical use of the property or item; ability to regulate access; the totality of the circumstances surrounding the search; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of the expectation of privacy considering the specific facts of the case.

Id. (citations omitted) As set forth in Minnesota v. Carter, 525 U.S. 83, 90 (1998), "an overnight guest in a home may claim the protection of the Fourth Amendment, but one who is merely present with the consent of the householder may not."

Defendant Davis acknowledges that "the Eighth Circuit has held that a guest does not have Fourth Amendment standing to contest the legality of a search conducted at his host's home,"[1] but urges the Court to follow the reasoning and holding of the Tenth Circuit in United States v. Poe, 556 F.3d 1113 (10th Cir. 2009), where the court held that a social guest has standing to challenge a

---

[1] Defendant cites the case of United States v. Nabors, 761 F.2d 465 (8th Cir. 1985), and states that "[t]he Court looked at facts such as the defendant did not have a key, never spent the night at the residence, did not have unencumbered access to the residence, and was not allowed to enter the residence unless the resident was present." (Doc #33 as 2)

search of the host's home. (Defendant's Supplemental Briefing in Support of Motion to Suppress Illegally Obtained Evidence and Statements (doc #33 at 2-3)) Defendant argues that the court found that a social guest has standing when he can demonstrate "a degree of acceptance into the household" and "an ongoing and meaningful connection" to the host's home. (Id.) The Poe court found that defendant Poe demonstrated "a degree of acceptance into the household" and "an ongoing and meaningful connection" to his host's home where the host allowed Poe to remain at the house when she left for work after 10:00 p.m.; that until a month earlier, Poe had lived at the residence with the host for over a year; that Poe retained a key to the house with the host's knowledge; that Poe kept clothes at the house; that Poe was a regular visitor since he had moved out to shower, shave, change clothes and eat; and that Poe had been observed inviting another visitor into the house. United States v. Poe, 556 F.3d 1113, 1122 (10th Cir.), cert. denied, 558 U.S. 946 (2009).

Defendant Davis has presented no legitimate expectation of privacy in 1702 Bellaire and no evidence to demonstrate "a degree of acceptance into the household" and "an ongoing and meaningful connection" to the host's home as set forth in Poe. While defendant Davis was present when officers arrived at 1702 Bellaire and advised that he was friends with the woman who resided at 1702 Bellaire (see Fact Nos. 8, 9 and 14, supra), that appears to be the extent of his connection to that residence. The evidence before the Court is that Davis gave his home address as 1842 East 59th Terrace. (See Fact No. 14, supra) Davis told officers that he had arrived at 1702 Bellaire approximately twenty minutes before the police arrived and that he was there waiting on a ride. (Id.) Defendant Davis was not alone in the residence; three other persons were present. (See Fact No. 10, supra) No evidence was presented to suggest that Davis was allowed to be alone in the residence, that he had a key to the residence or that he was ever an

13

overnight guest at the residence.

The Court finds that defendant Davis has not met his burden of proving a reasonable expectation of privacy in the premises at 1702 Bellaire. Thus, defendant Davis has no standing to challenge the officers' entry into and search of the residence.

C. Statements

Finally, defendant's motion seeks suppression of any statements he made as fruits of the unreasonable searches and seizures. As set forth above, the Court finds that no constitutional violation occurred on September 11, 2013, and defendant lacks standing to raise any constitutional challenge to the search that took place on December 8, 2014. Therefore, any statements made by defendant could not be considered a fruit of the poisonous tree.

## IV. CONCLUSION

Based on the foregoing, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying defendant Jordan C. Davis' Motion to Suppress Illegally Obtained Evidence and Statements (doc #22).

Counsel are reminded they have fourteen days from the date of receipt of a copy of this Report and Recommendation within which to file and serve objections to same. A failure to file and serve timely objections shall bar an attack on appeal of the factual findings in this Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.

                                            */s/ Sarah W. Hays*
                                              SARAH W. HAYS
                              UNITED STATES MAGISTRATE JUDGE